198 F.3d 1104 (9th Cir. 2000)
 HELEN WEYER, WILLIAM WEYER, and the marital community composed thereof, Plaintiffs-Appellants,
v.
TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation doing business in Washington, UNUM LIFE INSURANCE COMPANY OF AMERICA, a Nevada corporation doing business in Washington, Defendants-Appellees.
 No. 98-35215
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted May 7, 1999
Filed January 3, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: Lonnie Davis, Disabilities Law Project, Seattle, WA, for the appellants.
 Jeffrey A. Hollingsworth & Zane A. Brown, Jr., Perkins Coie LLP., Seattle, WA, for appellee Twentieth Century Fox Film Corp.
 D. Michael Reilly & Todd L. Nunn, Lane Powell Spears Lubersky LLP, for appellee UNUM Life Insurance Company.
 Stephen C. Monkarsh & Donna D. Melby, Sedgwick, Detert, Moran & Arnold, Los Angeles, CA, for appellee UNUM Life Insurance Company.
 Ann M. Courtney, UNUM Life Insurance Company of America, Portland, Me, for appellee UNUM Life Insurance Company
 Robert J. Gregory, Equal Employment Opportunity Commission, Washington, D.C., as amicus curiae in support of appellants.
 Gregory G. Katsas & Clinton R. Pinyan, Jones, Day, Reavis & Pogue, Washington D.C., as amicus curie for American Council of Life Insurance and Health Insurance Association of America in support of appellees.
 Appeal from the United States District Court for the Western District of Washington; William L. Dwyer, District Judge, Presiding. D.C. No. CV-96-01661-WLD
 Before: Robert R. Beezer, Charles Wiggins, and Andrew J. Kleinfeld, Circuit Judges.
 OPINION
 KLEINFELD, Circuit Judge:
 
 
 1
 This case concerns whether an employer and its insurance administrator can offer a group disability insurance policy as a fringe benefit that gives more benefits for physical disabilities than for mental disabilities, without violating the Americans with Disabilities Act or related Washington statutes.
 
 I. Facts
 
 2
 Helen Weyer worked for Twentieth Century Fox Film Corporation ("Fox") as an Administrative Coordinator. As one of its fringe benefits, Fox offered Weyer and the rest of its employees the chance to buy a favorable group long-term disability insurance policy administered by UNUM Life Insurance Company of America ("UNUM"). Weyer chose to buy the policy. Although she paid for the premiums herself, she paid a discounted group rate rather than a substantially higher individual policy rate. In addition, because Weyer enrolled in the group policy, she did not have to take the standard physical exam for individual policies.
 
 
 3
 Under the policy, individuals who were disabled because of mental illness, alcoholism, or drug abuse could only get benefits for twenty-four months.[1] Individuals withphysical disabilities were not subject to the same limitation and could get benefits until age 65.
 
 
 4
 In March 1994, Weyer became unable to work because of severe depression. She was totally disabled and has remained so during all times relevant to this lawsuit. Because of her disability, Weyer quit working at Fox and got benefits under the policy for two years. In March 1996, Weyer stopped getting benefits because her disability from depression, which was considered a mental illness, was subject to the twenty-four month limitation.
 
 
 5
 When Fox chose the UNUM policy, UNUM had another policy that did not contain the twenty-four month limit. The policy without the limit, however, was rare in the industry and more expensive because of the increased risk. Though the employees, not Fox, paid the premiums, Fox sought to avoid expensive plan features that would make the policy less desirable as a fringe benefit, by deterring healthy employees from buying the group policy.
 
 
 6
 Weyer sued Fox and UNUM under Titles I and III of the Americans with Disabilities Act ("Act") and related Washington statutes for offering and administering a plan that discriminated against those with mental disabilities in favor of those with physical disabilities. The district court granted summary judgment for Fox and UNUM on all counts, and Weyer appeals.
 
 II. Analysis
 
 7
 We review a district court's grant of summary judgment de novo.[2] We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.[3]
 
 
 8
 A. Is Weyer a "qualified individual" under Title I?
 
 
 9
 Title I of the Act says that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment."[4] The plain language of the Act thus allows only those who are "qualified individuals" to bring suit. The Act defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[5]
 
 
 10
 "An ADA plaintiff bears the burden of proving that she is a `qualified individual with a disability' -that is, a person `who, with or without reasonable accommodation, can perform the essential functions' of her job."[6] A totally disabled person who cannot "perform the essential functions of the employment position" with or without reasonable accommodations thus cannot be a "qualified individual " entitled to sue under Title I of the Act. We so held in Kennedy v. Applause, Inc.[7] There, we explained that "[b]ecause [the plaintiff] was totally disabled, there was no genuine issue [of fact] that she could have performed her job with the proposed, or any other, accommodation."[8]
 
 
 11
 Weyer got Social Security benefits for total disability, identified herself as "totally disabled" to Fox and UNUM as late as September 1996, and presented no evidence that she could perform the essential functions of her former employment position with or without reasonable accommodation. Her brief concedes that "[t]here is no dispute that Ms. Weyer is totally disabled."[9] She therefore did not raise a material issue of fact as to whether she was a "qualified individual" entitled to sue under Title I.[10]
 
 
 12
 That Weyer seeks a remedy for discrimination in fringe benefits applicable to a time following her employment does not alter the plain statutory requirement that she must be able to "perform the essential functions of the employment position" to sue under Title I of the Act. Five circuits have so held, and we are not persuaded to decide the issue differently. In Parker v. Metropolitan Life Ins. Co.,[11] the Sixth Circuit dealt with a case that is materially identical to this one. The plaintiff in Parker was totally disabled from depression and got benefits under a policy with the same two year limitation on mental disabilities.[12] When the benefits ended after two years, the employee sued under Title I. The Sixth Circuit held that the plaintiff had no standing to sue under Title I because she "was at no time a `qualified individual with a disability' " under the plain meaning of the statute.[13] The Sixth Circuit explained that "[a]t the time she could `perform the essential functions' of her job, she was not disabled for purposes of her long term disability claim, and therefore was not covered by the Disabilities Act, and at the time her insurance benefits were terminated, she could no longer perform her job."9[14] While the Sixth Circuit said that excluding those in the plaintiff's position might have resulted from Congressional "oversight," they declined "to rewrite the statute in a way that conflicts with what appears to be fairly clear language."[15] "Such an oversight is . . . for Congress to remedy."[16] By quoting this language from the opinion, we do not intimate that the statutory language resulted from oversight; Congress may have intentionally limited the scope of the Act as it did.
 
 
 13
 Similarly, the Seventh Circuit in EEOC v. CNA Ins. Cos.[17] held that a totally disabled plaintiff could not sue under Title I for alleged discrimination in a similar long-term disability policy. The Seventh Circuit noted that Title I expressly refers to the ability to perform a job, not the ability to receive benefit checks,[18] and said that the plaintiff's efforts to shoehorn "a person who is no longer able to hold an `employment position' " into the definition of a "qualified individual" were "strained."[19]
 
 
 14
 The Eighth Circuit in Beauford v. Father Flanagan's Boys' Home[20] held that a totally disabled plaintiff alleging discrimination in the employer's refusal to approve certain fringe benefits could not sue under similar language in the Rehabilitation Act.[21] The Eighth Circuit reasoned that because "Beauford admits that she cannot perform the essential functions of the job in question and further states that she will be unable to do so in the near future, . . . she does not meet the prerequisites to be protected under this provision."[22]
 
 
 15
 [B]oth the language of the statute and its interpreta tion by the Supreme Court [in Southeastern Commu nity College v. Davis[23]] indicate that section 504 was designed to prohibit discrimination within the ambit of an employment relationship in which the em ployee is potentially able to do the job in question . Though it may seem undesirable to discriminate against a handicapped employee who is no longer able to do his or her job, this sort of discrimination is simply not within the protection of section 504.[24]
 
 
 16
 The Eleventh Circuit followed suit in Gonzales v. Garner Food Services, Inc.,[25] in which it held that a plaintiff whose health benefits were capped after he was fired was not entitled to sue under the Act. The Eleventh Circuit specifically relied on the reasoning of Beauford and concluded that because the plaintiff was not "capable of performing essential functions of an available job with GFF at or subsequent to the time the alleged discriminatory conduct was committed, he was not a [qualified individual] within the meaning of the ADA."[26]
 
 
 17
 Finally, the Tenth Circuit recently adopted the same position in dicta. In Smith v. Midland Brake, Inc. ,[27] the Tenth Circuit explained that "a `qualified individual with a disability' has to be someone who can perform the essential functions of a job."[28]
 
 
 18
 Likewise, we join with the Circuits holding that former employees are not "qualified individuals" capable of suing under Title I of the Act. In Gonzales,[29] the Eleventh Circuit rejected the argument that "since the fruits of many fringe benefits are realized during the post-employment period, Congress must have intended former employees to be protected under the ADA as well."[30] Instead, the Eleventh Circuit held that [w]e find the plain language of the ADA clearly demonstrates the intent of Congress to limit the scope of the Act to only job applicants and current employees capable of performing essential functions of available jobs. We find no clearly expressed legislative intent suggesting that former employees such as [the plaintiff] should be covered under the Act as well.[31]
 
 
 19
 The Eleventh Circuit reasoned that "interpreting the ADA to allow any disabled former employee to sue a former employeressentially renders the [qualified individual ] requirement under the Act, that an individual with a disability hold or desire a position the essential functions of which he or she can perform, meaningless."[32]
 
 
 20
 The Seventh Circuit agreed with the Eleventh Circuit in CNA Ins. Cos. and held that "[b]ecause[the plaintiff] no longer has an `employment position' with CNA, nor is she an applicant, she has no claim under S 102."[33] Distinguishing a Title VII case that gave former employees a cause of action for retaliation for protected activity, the Seventh Circuit explained that nothing happened that discriminated against [the plaintiff] during the time she was working at CNA. The only thing that occurred was CNA's 1985 deci sion to reduce the long-term benefits available to all of its employees for mental health problems. While in [the Title VII case] the protected interest of the former employee arose during the period of employ ment, it did not here.[34]
 
 
 21
 Weyer and amici argue that the 1997 Supreme Court decision, Robinson v. Shell Oil Co.,[35] makes these authorities bad law. In Robinson, the Supreme Court held that the term "employees" in Section 704(a) of Title VII includes former employees.[36] The Court began its inquiry by noting that the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning."[37] The Court then reasoned that the statute was ambiguous because "there was no temporal qualifier in the statute such as would make plain that S 704(a) protects only persons still employed at the time of the retaliation."[38] The Court ultimately concluded that, because the surrounding provisions clearly contemplated suits by former employees,"it is far more consistent to include former employees within the scope of `employees' protected by S 704(a)."[39]
 
 
 22
 Weyer and amici argue, by analogy, that Title I of the Americans With Disabilities Act is ambiguous as to whether one must be a "qualified individual" at the time of the discrimination and whether a former employee can sue, because Title I also contains no "temporal qualifiers. " The Second and Third Circuits have so held.[40] These Circuits argue that the majority reading of Title I is inconsistent withS 12112(b)(2), which puts the provision of fringe benefits within the ambit of the Act, and reason that former employees must be included because "certain fringe benefits such as pensions and VSF benefits are provided only post-employment and are meaningful only in that context."[41] We reject this view because the statutes are not analogous. Title I of the Americans With Disabilities Act, unlike Title VII in the Civil Rights Act, is unambiguous. "Our inquiry must cease if the statutory language is unambiguous and `the statutory scheme is coherent and consistent.' "[42]
 
 
 23
 Title I unambiguously excludes totally disabled persons. Title I, unlike the section of Title VII at issue in Robinson, has a "temporal qualifier." Title I says that"[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual. " A "qualified individual" is someone who "can perform ." That definition uses the present tense. Thus, one must be able to perform the essential functions of employment at the time that one is discriminated against in order to bring suit under Title I. In addition, one must be discriminated against "because of the disability" -which requires that the disability exist at the time of the discrimination and be the motivation for the discrimination.
 
 
 24
 This reading makes sense. Congress could reasonably decide to enable disabled people who can work with reasonable accommodation to get and keep jobs, without also deciding to equalize post-employment fringe benefits for people who cannot work. We join the five circuits that have held that only persons who can perform the essential functions of a job can sue under Title I, rather than the two circuits that have held to the contrary, for compelling reasons. First, the statute says so, quite plainly. Second, most circuits have said that it says so. Third, there is a sensible purpose Congress may well have had in saying so, which gives us confidence that we understand the words. Fourth, other legislation, such as ERISA, addresses fringe benefits for people unable to perform the functions of a job even with reasonable accommodations. Finally, other sections of the Act suggest that this distinction is intentional. For example, Title III of the Act regarding public accommodations applies not to "qualified individuals," but simply to any "individual."[43]
 
 
 25
 We agree with the Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits that someone who is totally disabled cannot sue under Title I's unambiguous provisions. Weyer is not a "qualified individual" because she cannot now perform the essential functions of the employment position as a result of her total disability, and because she was not disabled at the time of the alleged discriminatory conduct. The term "qualified" limits the protection of Title I of the Act.
 
 
 26
 Title I also unambiguously excludes former employees. A "qualified individual" is one who "can perform the essential functions of the employment position that such individual holds or desires." "Holds," in the present tense, refers to current employees. Likewise, "desires," in the present tense, refers to people who presently want jobs, as opposed to those who do not, protecting job applicants against discrimination. This is language well designed to help people get and keep jobs, not to help those no longer able to work get disability pay. Congress has the authority to improve the circumstances of disabled people in some respects even if it does not improve them in all respects. A statute may provide a partial remedy for what Congress perceives as a social problem because the proponents are compelled to compromise with others who think a broader statute would be a worse social problem.
 
 
 27
 We cannot avoid an inter-circuit conflict, because the Second and Third Circuits have held contrary to the Seventh and Eleventh Circuits. In Ford v. Schering-Plough Corp.,[44] the Third Circuit explained that
 
 
 28
 [o]nce an individual becomes disabled and thus eli gible for disability benefits, that individual loses the ability to sue under a strict reading of Title I's defini tion of "qualified individual with a disability" because that individual can no longer work with or without a reasonable accommodation. In order for the rights guaranteed by Title I to be fullyeffectuated, the definition of "qualified individual with a disability" would have to permit suits under Title I by more than just individuals who are currently able to work with or without reasonable accommodations.[45]
 
 
 29
 The Second Circuit held the same way in Castellano v. City of New York.[46]
 
 
 30
 The Second Circuit reasoned that a narrow reading may "permit irrational discrimination as between disabled retirees, some of whom (for whatever reason) could still perform the essential functions of their former employment and others of whom could not."[47]
 
 
 31
 We cannot accept the Third Circuit's view, that we should construe Title I contrary to what it says "in order for the rights guaranteed by Title I to be fully effectuated." It is rare, in a diverse democratic republic, for there to be a solid legislative majority for "fully effectuating" any interest to the exclusion of all competing interests. For example, Congress in passing the Americans With Disabilities Act had to consider among the many serious interests affected (1) helping disabled people who could work to get jobs; (2) avoiding such heavy burdens on employers of disabled people that the risks of covert illegal discrimination would be less than the risks of employing disabled people; (3) avoiding increasing the costs of employing disabled people so much that the number of jobs for all people would be adversely affected; (4) avoiding pushing costs of fringe benefits higher so that nondisabled people in good health would elect not to be covered, generating a vicious cycle of adverse selection; (5) maintaining legislative focus on the main problems addressed to avoid jeopardizing a majority over secondary problems.
 
 
 32
 Legislation often results from a delicate compromise among competing interests and concerns. If we were to "fully effectuate" what we take to be the underlying policy of the legislation, without careful attention to the qualifying words in the statute, then we would be overturning the nuanced compromise in the legislation, and substituting our own cruder, less responsive mandate for the law that was actually passed.
 
 
 33
 Finally, we note that even if Weyer were a "qualified individual" under Title I, she still could not sue UNUM because UNUM is not a "covered entity."[48] Title I defines a "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee."[49] UNUM was none of these. It was simply the administrator of the employer's disability policy. That UNUM was an "employer" of its own employees does not make it an employer of Weyer and subject to suit by Weyer under the Act.
 
 
 34
 B. Is Title III applicable to UNUM?
 
 
 35
 Title III of the Act says that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[50] UNUM makes three arguments as to why Weyer cannot bring suit against it under Title III. First, UNUM says that it is not a place of public accommodation. Second, UNUM says that Title III relates only to the availability of goods and services and not the content of the goods. Third, UNUM says its activities fall within the Act's safe harbor for insurance underwriting.[51] We agree with UNUM and believe that each reason is independently sufficient to prevent Weyer's suit against UNUM under Title III.
 
 
 36
 We note at the outset that neither Fox nor UNUM question Weyer's ability to bring a suit regarding her employment relationship under Title III. Our recent decision in Zimmerman v. State Department of Justice,[52] however, calls into doubt whether Weyer can sue under Title III about matters relating to her employment. In Zimmerman, we held that a plaintiff could not sue for discriminatory employment practices under Title II of the Act because "employment by a public entity" is not a "service, program, or activity" of a public entity within the meaning of Title II. We explained in Zimmerman that "the structure of the ADA as a whole unambiguously demonstrates that Congress did not intend for Title II to apply to employment."[53] This was so because "Congress . . . crafted extensive employment-specific provisions in Title I " and "omitted any mention of employment in Title II."[54] We see no reason why the rationale of Zimmerman on Title II would not apply equally to Title III. Indeed, the Sixth Circuit has so held.[55] Because neither Fox nor UNUM challenge whether Title III permits a suit relating to an employment relationship, however, we assume for purposes of this case only, that Weyer states a valid cause of action under Title III.
 
 
 37
 Title III provides an extensive list of "public accommodations" in S 12181(7), including such a wide variety of things as an inn, a restaurant, a theater, an auditorium, a bakery, a laundromat, a depot, a museum, a zoo, a nursery, a day care center, and a gymnasium. All the items on this list, however, have something in common. They are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services. The principle of noscitur a sociis requires that the term, "place of public accommodation," be interpreted within the context of the accompanying words, and this context suggests that some connection between the good or service complained of and an actual physical place is required.[56]
 
 
 38
 The question then is whether an insurance company, like UNUM, that administers an 0employer-provided disability plan is a "place of public accommodation." Certainly, an insurance office is a place where the public generally has access. But this case is not about such matters as ramps and elevators so that disabled people can get to the office. The dispute in this case, over terms of a contract that the insurer markets through an employer, is not what Congress addressed in the public accommodations provisions.
 
 
 39
 The Sixth Circuit addressed precisely this issue in Parker v. Metropolitan Life Ins. Co.[57] In Parker, the Sixth Circuit held that a plaintiff could not sue an insurance company that issued a long-term disability policy for an employer under Title III of the Act because it was not a "place of public accommodation" within the meaning of the Title III. The Sixth Circuit explained that [w]hile we agree that an insurance office is a public accommodation as expressly set forth in S 12181(7), plaintiff did not seek the goods and services of an insurance office. Rather, Parker accessed a benefit plan provided by her private employer and issued by MetLife. A benefit plan offered by an employer is not a good offered by a place of public accommoda tion. As is evident by S 12187(7) [sic], a public accommodation is a physical place . . . .[58]
 
 
 40
 The Sixth Circuit found dispositive the fact that there was "no nexus between the disparity in benefits and the services which MetLife offers to the public from its insurance office."[59]
 
 
 41
 The Third Circuit took the same position in Ford v. Schering-Plough Corp.[60] In Ford, the Third Circuit reasoned that
 
 
 42
 [t]he plain meaning of Title III is that a public accommodation is a place . . . . Since Ford received her disability benefits via her employment at Scher ing, she had no nexus to MetLife's "insurance office" and thus was not discriminated against in connection with a public accommodation . . . Ford cannot point to these terms ["goods, services, facili ties, privileges, advantages, or accommodation"] as providing protection from discrimination unrelated to places.[61]
 
 
 43
 We agree with the Third and Sixth Circuits and hold that an insurance company administering an employerprovided disability policy is not a "place of public accommodation" under Title III.
 
 
 44
 The Third and Sixth Circuits have also both held that "Title III does not govern the content of a long-term disability policy offered by an employer."[62] Title III prohibits discrimination in the enjoyment of "the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." The ordinary meaning of this language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services. This language does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided. Thus, a bookstore cannot discriminate against disabled people in granting access, but need not assure that the books are available in Braille as well as print.[63] "[L]ikewise, an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the non-disabled."[64] We find the Third Circuit's analogy persuasive and hold that Title III does not address the terms of the policies that UNUM sells.
 
 
 45
 Even if UNUM were a "place of public accommodation" and even if the content of the policy were actionable under Title III, UNUM's decision to classify the risks of mental illness, alcoholism, and drug abuse differently from physical disabilities falls within the safe harbor provision of S 12201(c). Section 12201(c) says that
 
 
 46
 Subchapters I and III of this chapter and title IV of this Act shall not be construed to prohibit or restrict --
 
 
 47
 (1) an insurer . . . or any agent, or entity that administers benefit plans . . . from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law. . . .
 
 
 48
 Paragraph[ ] (1) . . . shall not be used as a subterfuge to evade the purposes of subchapter I and III of this chapter.[65]
 
 
 49
 "The coverage of mental disability and physical disability involves different risks with different hazards (or exposure)."[66] By putting an insurance company "safe harbor" in the Act, Congress gained such freedom of choice for policy purchasers and efficiencies for insurers as might accrue if insurance companies were free to decide whether to cover and to what extent to cover various disabilities. Amici advise us that research shows that policies that do not place a limit on the duration of benefits receive nearly double the percentage of mental disorder claims as policies with such limits.[67]
 
 
 50
 C. Did Fox violate Titles I or III?
 
 
 51
 The crux of Weyer's complaint against Fox is that Titles I and III of the Act prohibit Fox from offering as a fringe benefit an insurance policy that gives different levels of benefits to those with different types of disabilities. Seven Circuits have specifically rejected this argument[68] and, in the process, offered a plethora of good reasons for doing so. We find their reasoning persuasive.
 
 
 52
 First, there is no discrimination under the Act where disabled individuals are given the same opportunity as everyone else, so insurance distinctions that apply equally to all employees cannot be discriminatory.[69] Fox did not treat Weyer any differently because of her disability. It simply gave her the same opportunity that it gave all the rest of its employees -buy into the group policy with the limitation at the cheaper, group price or buy her own individual insurance coverage without the limitation at whatever the market price may be. Like the Seventh Circuit,
 
 
 53
 we note that there is no claim here that [the Defendant] discriminated on the basis of disability in offering its pension plan to anyone. It did not charge higher prices to dis abled people, on the theory that they might require more in benefits. Nor did it vary the terms of its plan depending on whether or not the employee was dis abled. All employees--the perfectly healthy, the physically disabled, and the mentally disabled--had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two years if the problem was mental or nervous.[70]
 
 
 54
 Second, had Congress intended to control which coverages had to be offered by employers, it would have spoken more plainly because of the well-established marketing process to the contrary. "Insurers have historically and consistently made distinctions between mental and physical illness in offering health and disability coverage."[71] As the Equal Employment Opportunity Commission's ["EEOC "] guidance on health insurance explains, "[t]ypically, a lower level of benefits is provided for the treatment of mental/nervous conditions than is provided for the treatment of physical conditions."[72] Even the EEOC concluded in their guidance on health insurance, contrary to their litigation position in this case, that distinctions between types of disability do not violate the Act. Like the D.C. and Third Circuits, we decline the invitation to be a "super-actuary . . . by requiring insurers to justify their coverage plans."[73]
 
 
 55
 Since the passage of the Act, Congress passed the Mental Health Parity Act, which requires that health plans with no limit for medical benefits must also have no limit on mental health benefits. Congress rejected an amendment to the Health Insurance Portability and Accountability Act of 1996 that would have required parity in insurance coverage for mental and physical illnesses. Had Congress provided that the Act mean what Weyer and amici urge, then this subsequent legislation would have been superfluous. As the Seventh Circuit explained,
 
 
 56
 we are loath to read into [the Act] a rule that has been the subject of vigorous, sometimes contentious, national debate for the last several years. Few, if any, mental health advocates have thought that the result they would like to see has been there all along in the ADA.[74]
 
 
 57
 Weyer and amici offer little to refute this overwhelming weight of authority. Instead, they argue that the rest of the Circuits have just gotten it wrong, and look to the EEOC's new position and the recent Supreme Court decision in Olmstead v. L.C.[75] to carry the day. Neither can.
 
 
 58
 The EEOC's current interpretation of the Act is that it forbids differential insurance coverage in disability policies. That interpretation, however, is entitled to no deference. Rather than resolving an ambiguity or exercising delegated authority, it conflicts with the plain language of the statute, as interpreted by seven Circuits and the Supreme Court.[76] It conflicts with binding Title III regulations.[77] It conflicts with other EEOC guidance on a virtually identical issue.[78] And the EEOC does not even have "administrative authority " over Title III.[79]
 
 
 59
 Nor does Olmstead support Weyer's construction. In Olmstead, the State refused to transfer several institutionalized mentally ill patients from their institutions to community-care programs despite their treating physicians' recommendations. The patients challenged the State's actions under Title II of the Act. The Court held that the patients had stated a cause of action because unjustified institutional isolation of mentally ill patients was discrimination because of disability. Olmstead does not speak to insurance classifications such as the one at issue. Olmstead spoke to segregation of the disabled through unwarranted institutional confinement. Applying Olmstead to insurance classifications would conflict with theCourt's decisions in Alexander v. Choate[80] and Traynor v. Turnage,[81] which both endorse distinctions between types of disabilities, and Congress's clear instruction in the insurance safe harbor that the Act was not intended to reach common insurance practices such as underwriting of risks.
 
 
 60
 D. Did Fox violate the Washington Statute?
 
 
 61
 RCW 49.60.180 says that "[i]t is an unfair practice for any employer: . . . [t]o discriminate against any person in compensation or in other terms or conditions of employment because of . . . mental . . . disability." No Washington court has specifically addressed this issue, so Washington would look to federal discrimination law as an aid in interpreting RCW 49.60.[82] We take it, then, that Washington would construe their state statute as have seven circuits and the Supreme Court. We accordingly hold that RCW 49.60.180 does not prohibit an employer from offering disability insurance policies as an employment benefit that differentiate between mental and physical disabilities. The district court properly granted summary judgment for Fox on Weyer's claim.
 
 
 62
 E. Did UNUM violate Washington Statutes?
 
 
 63
 Weyer sued UNUM under RCW 49.60.178 and 49.60.215. UNUM's classification between types of disabilities does not violate either of these statutes.
 
 
 64
 RCW 49.60.178 says that "[i]t is an unfair practice for any person . . . in connection with an insurance transaction to cancel or fail or refuse to issue or renew insurance . . . to any person because of . . . mental . . . disability." By its terms, the statute applies only to a cancellation, a failure to issue or renew, or a refusal to issue or renew an insurance policy. Yet UNUM did none of these things. In fact, it issued Weyer a policy and paid her the full amount of benefits she was entitled to under that policy.
 
 
 65
 RCW 49.60.215 is Washington's analogue to Title III. It prohibits discrimination against mentally disabled individuals in public accommodations.[83] The Washington Supreme Court in Fell v. Spokane Transit Authority[84] stated four elements for a prima facie case under RCW 49.60.215:
 
 
 66
 (1) they have a disability recognized under the stat ute;
 
 
 67
 (2) the defendant's business or establishment is a place of public accommodation;
 
 
 68
 (3) they were discriminated against by receiving treatment that was not comparable to the level of designated services provided to individuals without disabilities by or at the place of public accommoda tion; and, (4) the disability was a substantial factor causing the discrimination.[85]
 
 
 69
 Weyer fails to make out a prima facie case under RCW 49.60.215. First, an administrator of an employerprovided disability insurance fringe benefit is not a "place of public accommodation" under RCW 49.60.215. Second, Fell explicitly requires plaintiffs to show differential treatment between disabled individuals and nondisabled individuals. Weyer alleges only that UNUM discriminated between types of disabilities. Third, UNUM did not treat Weyer any differently than anyone else. "[T]he test is comparable treatment,"[86] and UNUM treated everyone the same by offering the same policy to all individuals, whether disabled or not."[T]he statutory mandate to provide access to places of public accommodation is not a mandate to provide services"[87] which are not otherwise available to the general public.
 
 
 70
 In the absence of Washington authority to the contrary, we presume that Washington would construe its statutes consistently with seven Circuits and the Supreme Court.
 
 
 71
 Because it is clear that Weyer fails to state a claim under the state statutes, we need not determine whether the state statutes would be ineffective because of ERISA preemption.[88]
 
 
 72
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The UNUM disability policy provided:
 Benefits for disability due to mental illness, alcoholism or drug abuse will not exceed 24 months of monthly benefit payments unless the insured meets one of these situations.
 1. The insured is in a hospital or institution at the end of the 24-month period. The monthly benefit will be paid during the confinement.
 If the insured is still disabled when he is discharged the monthly benefit will be paid for a recovery period of up to 90 days.
 If the insured becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confine ment and another recovery period up to 90 more days.
 2. The insured continues to be disabled and becomes con fined:
 i. after the 24-month period; and
 ii. for at least 14 days in a row.
 The monthly benefit will be payable during confinement.
 The monthly benefit will not be payable beyond the maximum benefit period.
 "Hospital" or "institution" means facilities licensed to provide care and treatment for the condition causing the insured's disabil ity.
 "Mental illness" means mental, nervous or emotional diseases or disorders of any type.
 
 
 [2]
 See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998).
 
 
 [3]
 See Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir. 1997).
 
 
 [4]
 42 U.S.C. S 12112(a).
 
 
 [5]
 42 U.S.C. S 12111(8).
 
 
 [6]
 Cleveland v. Policy Management Sys. Corp., 119 S.Ct. 1597, 1603 (1999) (quoting the Act).
 
 
 [7]
 Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996).
 
 
 [8]
 Id. at 1482.
 
 
 [9]
 Appellant's Brief at 42.
 
 
 [10]
 See Kennedy, 90 F.3d at 1482.
 
 
 [11]
 Parker v. Metropolitan Life Ins. Co., 99 F.3d 181, 185 (6th Cir. 1996), rev'd on other grounds, 121 F.3d 1006 (6th Cir. 1997) (en banc).
 
 
 [12]
 See id. at 184.
 
 
 [13]
 Id. at 186.
 
 
 [14]
 Id.
 
 
 [15]
 Id. at 187.
 
 
 [16]
 Id.
 
 
 [17]
 EEOC v. CNA Ins. Cos., 96 F.3d 1039 (7th Cir. 1996).
 
 
 [18]
 Id. at 1044.
 
 
 [19]
 Id. at 1043.
 
 
 [20]
 Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768 (8th Cir. 1987).
 
 
 [21]
 29 U.S.C. S 794 (applying to "otherwise qualified handicapped individuals"); see also 45 C.F.R. S 84.3(k)(defining a "qualified handicapped person" as "a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question").
 
 
 [22]
 Beauford, 831 F.2d at 771.
 
 
 [23]
 Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979) (interpreting "otherwise qualified handicapped individuals" to mean "one who is able to meet all of a program's requirements in spite of his handicap") (emphasis added).
 
 
 [24]
 Beauford, 831 F.2d at 773.
 
 
 [25]
 Gonzales v. Garner Food Services, Inc., 89 F.3d 1523, 1531 (11th Cir. 1996).
 
 
 [26]
 Id. at 1530 (footnotes omitted).
 
 
 [27]
 Smith v. Midland Brake, Inc. , 180 F.3d 1154 (10th Cir. 1999).
 
 
 [28]
 Id. at 1161. The court further explained that the job that an individual can perform may be a different job from that which he previously held.
 
 
 [29]
 Gonzales, 89 F.3d at 1531.
 
 
 [30]
 Id. at 1526.
 
 
 [31]
 Id. at 1528.
 
 
 [32]
 Id. at 1529. See also Parker v. Metropolitan Life Ins. Co., 99 F.3d 181, 187 (6th Cir. 1996) (citing Gonzales with approval), rev'd on other grounds, 121 F.3d 1006 (6th Cir. 1997) (en banc).
 
 
 [33]
 CNA, 96 F.3d at 1045.
 
 
 [34]
 Id. at 1045.
 
 
 [35]
 Robinson v. Shell Oil Co., 519 U.S. 337 (1997).
 
 
 [36]
 Section 704(e) reads in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . ." 42 U.S.C.S 2000e-3(a). "Employee" is defined as "an individual employed by an employer . . ." 42 U.S.C. S 2000e(f).
 
 
 [37]
 Robinson, 519 U.S. at 340.
 
 
 [38]
 Id. at 341.
 
 
 [39]
 Id. at 345.
 
 
 [40]
 See Castellano v. City of New York, 142 F.3d 58 (2nd Cir. 1998); Ford v. Schering-Plough Corp., 145 F.3d 601 (3rd Cir. 1998).
 
 
 [41]
 Castellano, 142 F.3d at 67.
 
 
 [42]
 Robinson, 519 U.S. at 340 (quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)).
 
 
 [43]
 42 U.S.C. S 12182(a).
 
 
 [44]
 Ford v. Schering-Plough Corp. , 145 F.3d 601 (3rd Cir. 1998).
 
 
 [45]
 Id. at 606.
 
 
 [46]
 Castellano v. City of New York , 142 F.3d 58 (2nd Cir. 1998).
 
 
 [47]
 Id. at 67.
 
 
 [48]
 Cf. Bloom v. Bexar County, 130 F.3d 722, 724 (5th Cir. 1997) (holding that county was not a "covered entity" because court reporters are hired by the state, not the county). We note that insurance companies do not even meet the expansive (and questionable) First Circuit approach in Carparts Distributing Center v. Automotive Wholesaler's, 37 F.3d 12, 17 n.5 (1st Cir. 1994). See Bloom, 130 F.3d at 725 n.2 (noting that the authority underlying Carparts has largely been repudiated).
 
 
 [49]
 42 U.S.C. S 12111(2).
 
 
 [50]
 42 U.S.C. S 12182(a).
 
 
 [51]
 42 U.S.C. S 12201(c).
 
 
 [52]
 Zimmerman v. State Dept. of Justice, 170 F.3d 1169 (9th Cir. 1999).
 
 
 [53]
 Id. at 1176.
 
 
 [54]
 Id. at 1177.
 
 
 [55]
 See Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1015 (6th Cir. 1997) (holding that Title III does not apply to suit relating to benefits available by virtue of employment).
 
 
 [56]
 See id. at 1014.
 
 
 [57]
 Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006 (6th Cir. 1997) (en banc).
 
 
 [58]
 Id. at 1010.
 
 
 [59]
 Id. at 1011.
 
 
 [60]
 Ford v. Schering-Plough Corp. , 145 F.3d 601 (3d Cir. 1998).
 
 
 [61]
 Id. at 612-13.
 
 
 [62]
 Parker, 121 F.3d at 1012.
 
 
 [63]
 See Ford, 145 F.3d at 613.
 
 
 [64]
 Id.
 
 
 [65]
 42 U.S.C. S 12201(c).
 
 
 [66]
 Rogers v. Dept. of Health, Env't Control, 174 F.3d 431, 437 (4th Cir. 1999).
 
 
 [67]
 Id.
 
 
 [68]
 See Kimber v. Thiokol Corp. , 196 F.3d 1092, 1999 WL 1020834 (10th Cir. 1999); Rogers v. Dept. of Health, Environ. Control, 174 F.3d 431 (4th Cir. 1999); Ford, 145 F.3d at 608; Parker, 121 F.3d at 1015; CNA Ins. Co., 96 F.3d at 1044; Krauel, 95 F.3d at 678. Cf. Modderno, 82 F.3d at 1059 (rejecting the argument under the Rehabilitation Act).
 
 
 [69]
 See Ford, 145 F.3d at 608;Parker, 121 F.3d at 1015; CNA Ins. Co., 96 F.3d at 1044; Krauel, 95 F.3d at 678.
 
 
 [70]
 CNA Ins. Co., 96 F.3d at 1044.
 
 
 [71]
 See Rogers, 174 F.3d at 435.
 
 
 [72]
 Krauel, 95 F.3d at 678 (quoting EEOC: Interim Enforcement Guidance on Application of ADA to Health Insurance, reprinted in Fair. Empl. Prac. Man. 405:7115, 7118).
 
 
 [73]
 Ford, 145 F.3d at 612; see Modderno, 82 F.3d at 1062-63.
 
 
 [74]
 See CNA Ins. Co., 96 F.3d at 1044.
 
 
 [75]
 Olmstead v. L.C., 119 S.Ct. 2176 (1999).
 
 
 [76]
 See, e.g., FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32 (1982) ("[T]he courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.").
 
 
 [77]
 See 28 C.F.R. S 36.307(a) ("This part does not require a public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities.").
 
 
 [78]
 See EEOC: Interim Enforcement Guidance on Application of ADA to Health Insurance, reprinted in Fair. Empl. Prac. Man. 405:7115, 7118. See also INS v. Cardoza-Fonseca, 480 U.S. 421, 445 (1987) (holding that inconsistent agency interpretations are entitled to less deference).
 
 
 [79]
 See Adams Fruit Co. v. Barrett , 494 U.S. 638, 649 (1990).
 
 
 [80]
 Alexander v. Choate, 469 U.S. 287, 304 (1985).
 
 
 [81]
 Traynor v. Turnage, 485 U.S. 535, 549 (1988).
 
 
 [82]
 See, e.g., Xieng v. Peoples Nat. Bank, 844 P.2d 389, 399 (Wash. 1993) ("[I]n the absence of adequate state authority, federal authority is persuasive in interpreting RCW Ch. 49.60."); Reese v. Sears, Roebuck & Co., 731 P.2d 497, 504 (Wash. 1987) ("As an aid in construing RCW 49.60, we have often looked to relevant federal cases . . ..").
 
 
 [83]
 RCW 49.60.215 reads:
 It shall be an unfair practice for any person . . . to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, or the requiring of any person to pay a larger sum than the uniform rates charged other persons, or the refusing or withholding from any person the admission, patronage, cus tom, presence, frequenting, dwelling, staying, or lodging in any place of public resort, accommodation, assemblage, or amuse ment, except for conditions and limitations established by law and applicable to all persons, regardless of . . . the presence of any sensory, mental, or physical disability. . . .
 
 
 [84]
 Fell v. Spokane Transit Authority, 911 P.2d 1319 (Wash. 1996).
 
 
 [85]
 Id. at 1328.
 
 
 [86]
 Id. at 1330.
 
 
 [87]
 Id. at 1329.
 
 
 [88]
 See California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 335 (1997) (Scalia, J., concurring) (noting that fourteen prior Supreme Court decisions "have not succeeded in bringing clarity to the law"); People of Territory of Guam v. Ulloa, 903 F.2d 1283 (9th Cir. 1990) (declining to reach a preemption argument because the government had misinterpreted the statute authorizing it to appeal).