Madeleine **FLETCHER**, Plaintiff,

v.

**TUFTS UNIVERSITY and Metropolitan Life Insurance Company, Defendants.**

No. CIV.A.02–10923–RCL.

United States District Court,
D. Massachusetts.

April 15, 2005.

Inga S. Bernstein, Zalkind, Rodriguez, Lunt & Duncan, Boston, MA, for Madeleine Fletcher, Plaintiff.

Stephen S. Churchill, Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, David C. Henderson, Nutter, McClennen & Fish, LLP, James F. Kavanaugh, Jr., Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

LINDSAY, District Judge.

#### I. Introduction

Madeleine Fletcher ("Fletcher" or "the plaintiff") is a former employee of defendant Tufts University ("Tufts"). During the time of her employment, Tufts provided its employees, including Fletcher, with the opportunity to subscribe to a long-term disability benefits plan (the "LTD Plan" or "the Plan") issued by defendant Metropolitan Life Insurance Company ("MetLife"). Fletcher subscribed to the LTD Plan and, after being diagnosed with a debilitating mental disorder, sought and received long-term disability benefits under the Plan. Because MetLife determined that Fletcher's disability was the result of a mental illness and she was not institutionalized, MetLife terminated her long-term disability payments after two years, pursuant to the terms of the Plan. Had she suffered a physical disability, Fletcher's benefits would have continued until she reached age sixty-five.

The amended complaint is in three counts: count I charges Tufts with a violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112; count II charges MetLife with a violation of Title III of the ADA, 42 U.S.C. § 12182; and count III charges violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1), by both Tufts and MetLife. The plaintiff filed a motion to amend her complaint further to add MetLife to count I. That motion was denied without prejudice because the plaintiff failed to comply with the certification requirements of this court's Local Rule 7.1. The docket does not indicate that any further action has been taken by any of the parties regarding the motion.

Both defendants have moved to dismiss the amended complaint pursuant to Fed. R.Civ.P. 12(b)(6).

#### II. Factual Allegations

The following allegations are made in the amended complaint ("Compl.").

Fletcher became a professor of Spanish literature at Tufts in 1980. Compl. ¶ 4, 13. As noted above, Tufts provided Fletcher with long-term disability insurance pursuant to the LTD Plan. Compl. ¶¶ 5–6.

In April of 1998, Fletcher wrote a letter to one of her classes that triggered concerns about her mental health. Compl. ¶ 14. She was admitted to a hospital, where she was diagnosed by a psychiatrist with bipolar disorder, manic type, with psychotic features. Compl. ¶ 15. After her release from the hospital, Fletcher was treated by two psychiatrists who concluded that she had an ongoing psychotic disorder that rendered her "grossly disabled." Compl. ¶ 16. Tufts placed Fletcher on

medical leave from September 1, 1998 through January 31, 1999. Compl. ¶ 17.

Following her medical leave, Fletcher remained unable to work, and MetLife approved her request for disability benefits pursuant to the terms of the Plan. Compl. ¶ 24. She received those benefits from February 28, 1999 to February 27, 2001. Compl. ¶¶ 24–25. On February 27, 2001, the benefits were terminated, because MetLife concluded that Fletcher suffered from a mental disability and was not confined to a hospital or other institution. Compl. ¶ 25. Under the terms of the Plan, a participant who is "disabled due to mental illness and not confined in a hospital or institution" is entitled to benefits for the lesser of twenty-four months or the maximum benefit duration otherwise applicable under the Plan. *See* Plaintiff's Opposition to Defendants Tufts University's and Metropolitan Life Insurance Company's Motion to Dismiss, Exh. C at 17 [1] ("Plaintiff's Opposition"). It was under this provision of the Plan that Fletcher's disability benefits were terminated.

In July of 2001, Fletcher underwent a "return to work evaluation" by a physician, Dr. Harvey Waxman. In a report dated August 1, 2001, Dr. Waxman concluded that Fletcher's continuing disability rendered her incapable of performing the essential functions of her job, and that no accommodation could be made that would allow her to work. Compl. ¶¶ 34–36. Based on Dr. Waxman's report, Tufts informed Fletcher that she could not return to her faculty position at Tufts. *Id.* at ¶ 37.

On December 10, 2001, Fletcher requested that MetLife review its decision to terminate her benefits. Compl. ¶¶ 9, 29. At some point before the plaintiff made this request, her counsel spoke to an au-thorized representative of MetLife who told plaintiff's counsel that MetLife "could probably" waive the sixty-day deadline for requesting a review of the benefits determination. Compl. ¶ 30. Notwithstanding this assurance, MetLife denied as untimely the request for a review. *Id.* On the same day that she sought internal review from MetLife of the decision to terminate her benefits, Fletcher also filed, with the Equal Employment Opportunity Commission ("EEOC"), charges of discrimination against Tufts and MetLife. Compl. ¶ 7, Compl. Exh. A. The charges alleged violations of the ADA by both defendants. On February 20, 2002, Fletcher received "right to sue" notices from the EEOC. Compl. ¶ 8, Compl. Exh. B.

Fletcher filed this lawsuit on May 20, 2002, alleging violations of Title I and Title III of the ADA by Tufts and MetLife, respectively. She amended her complaint on October 1, 2002, to include a claim that both defendants violated ERISA by improperly classifying her disability as mental rather than physical. Compl. ¶¶ 46–52.

### III. Discussion

#### A. *Motion to Dismiss Standard*

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must "accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." *Martin v. Applied Cellular Technology, Inc.,* 284 F.3d 1, 6 (1st Cir.2002). Dismissal is inappropriate unless "it appears beyond a doubt that the plaintiff can prove no set of facts in support of [her] claim[s] which would entitle [her] to relief." *Con-*

---

1. Because this document is referred to and relied upon in the complaint, it may be considered in connection with the disposition of the present motions. *See Beddall v. State Street Bank & Trust Co.,* 137 F.3d 12, 16–17 (1st Cir.1998).

*ley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. Count One: Title I of the ADA

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... employee compensation ... and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). In count I of the amended complaint, the plaintiff alleges that Tufts violated Title I by adopting and maintaining a long-term disability plan that discriminates against employees with mental disabilities. Specifically, Fletcher asserts that the LTD Plan discriminates against persons with mental disabilities by limiting to twenty-four months the period during which such persons are entitled to receive benefits if they are not confined in a hospital or institution, while allowing persons with physical disabilities to receive benefits until they reach the age of sixty-five irrespective of whether they are in a hospital or institution.

Tufts' response to count I of the plaintiff's claim is threefold. First, Tufts contends that the plaintiff is not a "qualified individual with a disability" under Title I of the ADA, and therefore lacks standing to sue under the statute. Second, Tufts asserts that the complaint should be dismissed as untimely. Finally, Tufts argues that, as a substantive matter, the ADA does not prohibit long-term disability plans, like the LTD Plan, from offering less coverage for mental disabilities than they offer for physical disabilities. I will address each of these issues in turn.

### (1) Is the Plaintiff a "Qualified Individual" under Title I of the ADA?

█ Title I of the ADA prohibits discrimination against a "qualified individual with a disability because of the disability of such individual ...." 42 U.S.C. § 12112(a).

Thus, a predicate to protection under Title I is that the claimant be a *qualified individual* with a disability. *See Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1108 (9th Cir.2000); ("The plain language of the act thus allows only those who are 'qualified individuals' to bring suit.") *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1161 (10th Cir.1999) ("The language [of Title I of the ADA] reveals that a person must meet the threshold test of being a 'qualified individual with a disability' in order to invoke the ADA."); *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 605 (3rd Cir.1998). ("Title I of the ADA restricts the ability to sue under its provisions to a 'qualified individual' with a disability[,]")

█ ▪ Title I defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Because the plaintiff is admittedly unable to perform the essential functions of her job, even with a reasonable accommodation, Tufts argues that she is not a "qualified individual" as expressly defined by Title I. Therefore, according to Tufts, the plaintiff falls outside the protection of the ADA. While the First Circuit has not yet addressed this issue, some courts have adopted Tufts' reading of the statute. *See, e.g., Weyer,* 198 F.3d at 1108–13 (holding that a totally disabled former employee is not a "qualified individual" under the plain meaning of the ADA and hence cannot state a claim under the statute); *Morgan v. Joint Adm. Board,* 268 F.3d 456, 457–58 (7th Cir.2001) (citing *EEOC v. CNA Ins. Cos.,* 96 F.3d 1039, 1041, 1045 (7th Cir.1996) for the proposition that "retired and other former workers are not protected by the employment provisions of the [ADA]").

The plaintiff contends that the defendant's interpretation of the ADA is too narrow, and that the term "qualified individual" should be read to include former employees. Her position has support in decisions of some federal courts of appeal, and from two district courts in the First Circuit. *See Castellano v. City of New York*, 142 F.3d 58, 68–70 (2d Cir.1998) (holding that the term "qualified individual" under Title I of the ADA covers *former* employees); *Ford*, 145 F.3d at 608 (allowing "disabled former employees to sue their former employers [under Title I of the ADA] regarding their disability benefits"); *Iwata v. Intel Corp.*, 349 F.Supp.2d 135, 147 (D.Mass.2004) (same); *Conners v. Maine Med. Ctr.*, 42 F.Supp.2d 34, 40–43 (D.Me.1999) (same). The absence of controlling precedent and the split of authority on this issue require me, in the context of the present dispute, to analyze whether Congress intended the term "qualified individual with a disability," in Title I of the ADA, to include formerly qualified employees who are totally disabled at the time that they seek the protection of the statute.

In *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), the Supreme Court held unanimously that the definition of "employees" under an anti-discrimination provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), includes former employees who sue for post-employment retaliatory discrimination. *Id.* at 346, 117 S.Ct. 843. In interpreting the scope of the term "employees" as used in Title VII, the Court first examined whether the statutory language had a plain and unambiguous meaning. *Id.* at 340, 117 S.Ct. 843. Because the term "employees" lacked a temporal modifier, the Court found the language of the statute ambiguous. *Id.* The Court resolved that ambiguity by looking to the purpose and broader context of Title VII. The Court noted that "several sections of [Title VII] plainly contemplate that former employees will make use of the remedial provisions of Title VII," and agreed with the petitioner that "the word 'employees' includes former employees because to hold otherwise would effectively vitiate much of the protection afforded by [Title VII]." *Id.* at 345, 117 S.Ct. 843.

Employing the same analytical approach that the Court used in *Robinson*, the Second and Third circuits have held that the definition of "qualified individual with a disability" in Title I of the ADA includes former employees. *See Castellano*, 142 F.3d at 68–70; *Ford*, 145 F.3d at 608.

In *Castellano*, for example, the Second Circuit looked first to the statutory definition of the term "qualified individual with a disability," and concluded that the absence of a temporal modifier rendered that definition ambiguous. *See* 142 F.3d at 67 ("[Section 12111(8)] fails to specify *when* a potential plaintiff must have been a 'qualified individual with a disability' in the context of a claim that the provision of retirement or fringe benefits is discriminatory."). The court then sought the meaning of the term "qualified individual" in the "broader context" and "primary purpose" of the ADA. *See id.* The court noted that excluding former employees from the definition of "qualified individual[s] with a disability" would undermine the purpose of other provisions of Title I of the ADA, particularly the statute's prohibition of discrimination as to fringe benefits, embodied in 42 U.S.C. § 12112(b) and 29 C.F.R. § 1630.4. *See id.* The court observed that "[m]any fringe benefits are paid out to those who no longer work and who are no longer able to work, and some fringe benefits are paid out to individuals precisely because they can no longer work." *Id.* at 68.

The *Castellano* court's reasoning can be restated along the following lines. Be-

cause "employees" generally are not entitled to receive disability-related fringe benefits unless they are unable to work, they frequently cannot enforce the ADA's prohibition of discrimination as to those benefits until they become former employees. Excluding former employees from the category of "qualified individuals" entitled to seek relief under the ADA would therefore effectively nullify prohibitions against discrimination in the provision of disability benefits by allowing employers to deny the benefits to a totally disabled employee at the only time the employee could claim them. Thus, the *Castellano* court recognized the "illogic inherent" in a statutory scheme interpreted to create a right to be free from discrimination in the post-employment provision of fringe benefits without also providing a corresponding mechanism by which that right could be enforced. *See id.* at 69. The court concluded that, when Congress limited the protection of the ADA to "qualified individual[s]," "Congress was concerned [only] that employers not be forced to hire, promote, or retain unqualified, disabled employees." *Id.* at 68. Consequently, "[w]here the alleged discrimination relates to the provision of post-employment benefits, rather than to hiring, promotion, or firing, Congress's expressed concern about qualifications is no longer implicated." *Id.* In other words, because a person entitled to long-term disability benefits *by definition* can no longer perform the essential functions of his or her job, the concern that such an employee be "qualified" to do that job is no longer of consequence.

■ I find the *Castellano* court's interpretation of the term "qualified individual" entirely persuasive. As suggested above, that interpretation recognizes the inherent contradiction between the ADA's broad remedial purpose and its express prohibition of discrimination as to fringe benefits, and a rule that would deny standing to a claimant of long-term disability benefits to seek a court remedy at the only time that the claimant is eligible to receive those benefits. *See Castellano*, 142 F.3d at 68–69; *Ford*, 145 F.3d at 606–07. I therefore embrace the conclusions of the Second and Third Circuits and conclude that former employees, who were able to perform the essential functions of the employment position for a period sufficient to qualify for long-term benefits and who allege that they are discriminated against with respect to long-term disability benefits on the basis of their disability, have standing to assert that claim. The plaintiff here thus is a "qualified individual" and has standing to bring the present Title I claim.

### (2) Are the Plaintiff's ADA Claims Timely ?

Tufts next argues that the plaintiff's ADA claims were untimely when filed with the EEOC, and that this action therefore must be dismissed because the plaintiff has failed to exhaust her administrative remedies. As Tufts correctly points out, the ADA mandates compliance with the procedural requirements set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–4—2000e–9. *See* 42 U.S.C. 12117(a). Under those requirements, a plaintiff must first file a *timely* charge with the EEOC or an appropriate state agency before she may pursue an ADA claim in federal court. *See* 42 U.S.C. § 2000e–5; *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 (1st Cir.1999) ("[A] claimant who seeks to recover for an asserted violation of Title I of the ADA ... first must exhaust administrative remedies by filing a charge with the EEOC ..., or alternatively, with an appropriate state or local agency, *within the prescribed time limits*.") (emphasis added). Determining the timeliness of the plaintiff's ADA claims requires an examination of both how long the plaintiff had to file

discrimination charges with the EEOC, and when that time period began to run.

### (a) How Long did the Plaintiff Have to File Her ADA Claims ?

Tufts contends that the plaintiff had a 240–day window in which to raise her ADA claims with the EEOC. Tufts begins with the statutory requirement that a plaintiff ordinarily must institute proceedings not later than 180 days after the alleged discriminatory act or practice occurred. *See* 42 U.S.C. § 2000e–5(e). Under Section 2000e–5(e), however, the 180–day limit is extended to 300 days in states like Massachusetts that have an anti-discrimination agency (here, the Massachusetts Commission Against Discrimination or "MCAD") and the aggrieved person has initially instituted proceedings with that agency. *Id.*

Tufts acknowledges that, under the statute, the plaintiff would have had 300 days to file her claim if she had initially instituted proceedings with the MCAD, but points out that the plaintiff never filed charges with the MCAD. Relying on the First Circuit's holding in *Johnson v. General Electric*, 840 F.2d 132, 133 (1st Cir.1988), Tuft argues that the plaintiff had a deadline of 240 days from the date of the alleged discrimination to file a charge with the EEOC, and she did not meet that deadline. In *Johnson*, the First Circuit held that when, as here, a plaintiff has not filed charges with the MCAD, the proper deadline for filing with the EEOC is 240 days, "to allow 60 days for deferral to the state agency." *Id.* at 132.

 The First Circuit's ruling in *Johnson*, as to the filing deadline, however, has been abrogated by *EEOC v. Commercial Office Products Company*, 486 U.S. 107, 125, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988). In that case, the Supreme Court held that

a state agency could waive the sixty-day deferral period pursuant to a worksharing agreement with the EEOC and thereby reinstate the 300–day window in which an aggrieved party may file a charge with the EEOC. *Id.* The MCAD has such a worksharing agreement with the EEOC. *See Seery v. Biogen, Inc.*, 203 F.Supp.2d 35, 44 (D.Mass.2002) (holding that the worksharing agreement between the MCAD and the EEOC causes the automatic and simultaneous institution and termination of state proceedings when a charge of disability discrimination is filed with the EEOC); *Cf. Lawton v. State Mut. Life Assur. Co. of America*, 101 F.3d 218, 221 (1st Cir.1996) ("Massachusetts is a so-called 'deferral jurisdiction' ... so exhaustion depends on the filing of a charge with the Equal Employment Opportunity Commission within *300 days* of the purported discriminatory act.") (emphasis added). In light of *Commercial Office Products*, then, I conclude that the worksharing agreement between the MCAD and the EEOC waives the sixty-day period for deferral to the state agency, and provided a 300–day window for the plaintiff to file her charges with the EEOC.[2]

### (b) When Did the Plaintiff's ADA Claims Accrue?

 Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e)(1), as applied to the ADA, 42 U.S.C. § 12117(a), a cause of action accrues on the date of the alleged unlawful employment practice. *See Wilson v. Globe Specialty Products, Inc.*, 117 F.Supp.2d 92, 94 (D.Mass.2000). Tufts contends that the alleged unlawful employment practice in this case occurred on the date that Met-Life classified the plaintiff's disability as a

---

**2.** Indeed, Fletcher's charge with the EEOC included a request that the EEOC file the charge simultaneously with the MCAD, which

puts her in an even better position than the plaintiff in *Seery*. *See Seery,* 203 F.Supp.2d at 39.

mental disability. Thus, according to Tufts, the plaintiff's cause of action accrued not later than February 28, 1999, the date on which the plaintiff began receiving long-term benefits for a disability that MetLife classified as a mental disability. Because the plaintiff did not file discrimination charges with the EEOC until over two and a half years later, on December 10, 2001, Tufts argues that her administrative claim was untimely.

The plaintiff counters that her claims under the ADA did not accrue until Met-Life actually terminated her disability benefits. Indeed, she goes even further, contending that her discrimination claims did not accrue until August, 2001, when she learned she could not return to work and would continue to require long-term disability benefits.

The cases Tufts relies on in support of its accrual argument derive from *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In *Ricks,* the Supreme Court held that the statute of limitations on a Title VII claim began to run from the date on which the plaintiff, a college professor, was denied tenure, not from the date of the actual termination of his employment. The court characterized the date of termination as simply "the delayed, but inevitable consequence of the denial of tenure." *Id.* at 257–58, 101 S.Ct. 498. In *Wilson,* Judge Tauro of this district applied the reasoning in *Ricks* and its progeny to a case that bears close factual resemblance to the present case. 117 F.Supp.2d at 95. He concluded that the termination of disability benefits to the *Wilson* plaintiff was merely the "delayed, but inevitable consequence" of the allegedly discriminatory decision to limit the plaintiff's eligibility for disability benefits to twenty-four months. *Id.* The judge therefore held that the *Wilson* plaintiff's claim accrued as soon as the plaintiff received notice that his disability had been

classified as a mental disability and that his benefits consequently would terminate after twenty-four months. *Id.*

The plaintiff here takes issue with Judge Tauro's conclusion in *Wilson,* noting, as has the First Circuit, that an overly expansive reading of *Ricks* may lead to problems of ripeness. *See Johnson v. General Electric,* 840 F.2d at 136 ("It is unwise to encourage lawsuits before the injuries resulting from the violations are delineated, or before it is even certain that injuries will occur at all."). For a narrower reading of *Ricks,* the plaintiff cites the First Circuit's decision in *Thomas v. Eastman Kodak Co.,* 183 F.3d 38 (1st Cir.1999). In that case, in which the plaintiff claimed that his layoff was motivated by racial discrimination, the court held that the discrimination claim accrued at the time the plaintiff received notice that he would be laid off and not, as the defendant claimed, at the time of the allegedly discriminatory performance reviews that formed the basis for the layoff. *Id.* at 55 ("We hold that the performance appraisals [the plaintiff] received in 1990, 1991, and 1992 did not trigger the statute of limitations in § 2000e–5(e)(1) at the time they were presented to [the plaintiff], because they did not have any crystallized implications or apparent tangible effects.").

Invoking *Thomas,* the plaintiff argues that MetLife's classification of her condition as a mental disability "did not have any crystallized implications or apparent tangible effects" until after twenty-four months had expired and her benefits were terminated. The plaintiff points out that she was eligible for disability benefits only for so long as her disability rendered her unable to work. Had she recovered from her disability and returned to work at Tufts before the twenty-four month period had expired, her benefits would have terminated by virtue of her recovery, and not

because of MetLife's allegedly discriminatory policy. Under these circumstances, the plaintiff says, she would not have suffered an injury, because she would not have been deprived of any benefits to which she was entitled.

I agree with the plaintiff that the principles set forth in *Thomas* govern this case, and that the plaintiff's claim accordingly did not accrue when she received notice that Tufts had classified her as a mental disability. I disagree, however, with her contention that her claims did not accrue until August 1, 2001, when she learned that she could not return to work and would continue to require long-term disability benefits. According to the plaintiff, it was not until that date that she learned that Tufts had determined that her disability precluded her return to work. But as the plaintiff alleges in the Amended Complaint, however, she knew as of February 27, 2001 that her benefits had been terminated. Compl. ¶ 25. She also knew, or she should have known at that time, that her benefits were terminated because the Plan limited the period in which she could receive benefits to two years, and that that limitation was the consequence of MetLife's having classified her disability as a mental disability. Thus on February 27, 2001, the plaintiff was aware of her injury—the termination of her benefits—and she was also aware, or should have been aware, of the cause of the injury—the allegedly discriminatory treatment of mental disabilities under the Plan. It was on that date then that the implications of the alleged discriminatory act of Tufts "crystallized" and its effects became apparent. *Thomas*, 183 F.3d at 55. Accordingly, I conclude that the plaintiff's claim of discrimination accrued not later than February 27, 2001. Because she filed her discrimination charge with the EEOC on December 20, 2001 (and thus only 296 days from the act that gave rise to the charge), her claim was timely filed.

### (3) Has the Plaintiff Stated a Claim Under Title I of the ADA?

By far, the most difficult issue in this case is whether the language in Title I of the ADA, barring discrimination against a qualified individual "because of the disability of such individual ...," 42 U.S.C. § 12112(a), prohibits a benefits package like the LTD Plan, which offers differing long-term disability benefits depending on whether one suffers from a physical or mental disability. A number of federal courts have held that such plans are not prohibited by Title I. *See, e.g., E.E.O.C. v. Staten Island Savings Bank,* 207 F.3d 144, 151–53 (2d Cir.2000); *Weyer,* 198 F.3d at 1116–18; *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1101–02 (10th Cir.1999); *Lewis v. Kmart Corp.,* 180 F.3d 166, 170 (4th Cir.1999); *Ford,* 145 F.3d at 608; *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1018 (6th Cir.1997) (en banc); *EEOC v. CNA Ins. Cos.,* 96 F.3d 1039, 1043–45 (7th Cir.1996); *Krauel v. Iowa Methodist Med. Ctr.,* 95 F.3d 674, 678 (8th Cir.1996); *Modderno v. King,* 82 F.3d 1059, 1060–62 (D.C.Cir.1996) (interpreting Section 504 of the Rehabilitation Act of 1973); *El–Hajj v. Fortis Benefits Ins. Co.,* 156 F.Supp.2d 27, 30–32 (D.Me.2001); *Wilson,* 117 F.Supp.2d at 95–97. For these courts, an employee benefits plan that offers differing long-term disability benefits based on the nature of the condition giving rise to the disability is not discriminatory, as long as the same plan is offered to all employees. The defendants here rely on these cases in contending that the LTD does not violate the ADA. The defendants argue that the ADA does not require that benefit plans, like the one at issue, provide benefits to participants with mental disabilities that are equal to the benefits provided to participants with physical disabilities. The First Circuit, however, has not yet spoken on the matter.

Some time ago, after reviewing the law in connection with the present motions, I concluded that, despite the substantial precedent to the contrary, Title I of the ADA prohibits discrimination among classes of persons with disabilities unless those distinctions are made in a manner consistent with safe harbor provision of the ADA. Until now, however, I have not found the opportunity to set forth in detail the reasons for my conclusion. Fortunately, my colleague, Chief Judge William G. Young of this district, has written a thoughtful and thorough explication of why the ADA generally prohibits discrimination among classes of persons with disabilities. *See generally Iwata*, 349 F.Supp.2d 135. His analysis of the issues and his conclusions as to the import of Title I in a case like the present one coincide with mine. In disposing of the present motions, therefore, I adopt what Judge Young has written.

Judge Young had before him in *Iwata* a long-term disability plan that limited a participant's receipt of benefits to two years if the participant was eligible for benefits due to a mental disability and was not hospitalized. No such limitation applied to participants with physical disabilities. The plan in *Iwata* was therefore like the LTD Plan in this case. Just as Fletcher does in this case, the plaintiff in *Iwata*, who was totally disabled by reason of a mental disability, argued, among other things, that the defendants' long-term benefit plan was discriminatory under the ADA. The defendants in that case argued, as do the defendants here, that the ADA does not require the LTD to equalize benefits as between participants with physical and mental disabilities.

■ In ruling on the defendants' motion under Fed.R.Civ.P. 12(b)(6), Judge Young

held that the plaintiff in *Iwata* had stated a claim of discrimination under Title I. In reaching that conclusion, he reviewed the language and structure of Title I, and its broad remedial purpose and legislative history, and derived from these sources the conviction that, as a general matter, Title I of the ADA prohibits disability plans that discriminate between persons with physical disabilities and those with mental disabilities. *Id.* at 147. He found further support for that view in the analysis of the issue in *Johnson v. K Mart Corp.*, 273 F.3d 1035 (11th Cir.2001). Judge Young acknowledged that the *Johnson* opinion had been vacated pending a rehearing en banc, but observed that "the logic of the opinion is worth considering, regardless of the opinion's precedential value in the Eleventh Circuit."[3] *Iwata*, 349 F.Supp.2d at 148.

After looking to the broad remedial purpose of the ADA and its language and legislative history, the *Johnson* court held that where a long-term disability plan provides fewer benefits for persons with mental disabilities than it provides for persons with physical disabilities, the plan, at least facially, violates Title I of the ADA. *Johnson*, 273 F.3d at 1054. The *Johnson* court's reasoning was informed by the concept of discrimination set forth in the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). In *Olmstead*, the Supreme Court, in deciding a claim brought under Title II, ruled that in enacting the ADA, Congress intended a comprehensive definition of the term "discrimination"—— a definition that includes not only a prohibition of disparate treatment that favors others against members of a protected class, but one that also prohibits disparate treat-

---

**3.** No rehearing has been held because of the bankruptcy of Kmart Corp. *See Johnson v. K* *Mart Corp.*, 281 F.3d 1368 (11th Cir.2002).

ment among members of the same protected class. 527 U.S. at 598–603, 119 S.Ct. 2176. The key question in both forms of discrimination is whether an entity covered by the ADA has discriminated against an individual *because of that individual's disability*. *Id.* Both the *Johnson* court and Judge Young reasoned that the broad concept of discrimination, found by the Supreme Court to apply to claims brought under Title II of the ADA, applies to claims brought under Title I as well. *Johnson*, 273 F.3d at 1053–54; *Iwata*, 349 F.Supp.2d at 149.

Following the lead of the *Johnson* and *Iwata* courts and applying *Olmstead's* broad principle that the ADA forbids discrimination among classes of persons with disabilities, I find the present LTD Plan suspect. In the words of the *Johnson* court, the LTD Plan, "which differentiates between individuals who are totally disabled due to a mental disability and individuals who are totally disabled due to a physical disability because of a given individual's type of disability...[,] appears *prima facie* to distinguish among beneficiaries on a basis that constitutes a form of discrimination that contravenes Title I of the ADA." *Johnson*, 273 F.3d at 1054.

On its face, the LTD Plan seems to have no justification for the difference it makes between participants totally disabled by reason of a mental disability and those totally disabled because of a physical disability, except perhaps in an unstated premise that a mental disability is a lesser form of disability than a physical disability, and mental disabilities only rise to the seriousness of physical disabilities when the claimant must be hospitalized. (As noted earlier, the Plan provides that

if the claimant with a mental disability is institutionalized, then benefits are not limited to the two-year period otherwise applicable.) While there is no evidence before me on the point, it is far from obvious that the cost of providing disability benefits to a hospitalized participant is less than the cost of providing such benefits to a non-hospitalized participant. *See Iwata* at 150–51. Indeed, because disability benefits are designed to address income lost from one's work, it would not seem to matter, from the perspective of cost, whether the participant is in a hospital. Implicit in the LTD Plan then is the suggestion that if a participant is in an institution, his/her disability assumes more of the character of a "real" disability. By contrast, the Plan appears to treat the participant whose mental disability does not require that the participant be institutionalized as though he or she has a disability that is less significant than either the hospitalized participant with a total mental disability or any participant with a total physical disability. Judge Young offered a possible explanation for this phenomenon: "[T]here appears to be a widespread practice of limiting disability benefits for mental illness, possibly based on assumptions that mental illness is 'less real' than physical disability, or that recovery therefrom is more a matter of will than in the case of physical disability." *Iwata*, 349 F.Supp.2d at 155.[4] If the LTD Plan's distinction between classes of persons with disabilities is based on such stereotypes or is otherwise arbitrary, Title I, considered in the light of *Olmstead*, would condemn the Plan as applied to Fletcher.

---

**4.** *See also* Jane Byeff Kern, *Crazy (Mental Illness Under the ADA)*, 36 U.Mich. J.L. Reform 585, 605 (2003) ("Many people believe that if mentally ill people would only try harder, they would get well. In this view, mental

illness is due to internal weakness or other personal shortcomings ... Mental illness is also seen by some as a myth, less real than a physical disorder.") (footnotes omitted).

On the other hand, as Judge Young reasoned in *Iwata*, one might well argue that plans like the one at issue here are not discriminatory because they apply equally to all employees and simply offer more protection against certain risks than against others. *Id.* In other words, a disability plan lawfully may provide less coverage for one kind of disability than for another if the difference in coverage is grounded in rational classifications of risk. Risk classification, after all, is fundamental to the business of insurance. The question then is whether there is some rational basis that justifies the distinction between what the LTD Plan offers by way of benefits to participants with physical disabilities and what it offers participants with mental disabilities. If there is such a justification, then the LTD Plan might withstand the attack that it discriminates among classes of persons with disabilities.

The ADA has a so-called safe harbor provision that is expressly applicable to Title I. That provisions states:

(c) Insurance.

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans or similar organizations from underwriting risks, classifying risks or administering such risks that are based on or not inconsistent with State law; or

(2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks or administering such risks that are based on or not inconsistent with State law; or

(3) a person or organization covered by this chapter from establishing, spon-

soring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2) and (3) shall not be used as subterfuge to evade the purposes of subchapter (sic) I and III of this chapter.

42 U.S.C. § 12201(c).

In explaining the purpose of the safe harbor provision, the House Judiciary Committee wrote:

The Committee added this provision because it does not intend for the ADA to affect legitimate *classification of risks in insurance plans,* in accordance with state laws and regulations under which such plans are regulated . . . .

Specifically, Section 5101(c)(1)[42 U.S.C. § 12201(c)(1) ] makes it clear that insurers may continue to sell to and underwrite individuals applying for life, health or other insurance on an individually underwritten basis . . . *so long as the standards used are based on sound actuarial data and not on speculation.* Section 501(c)(2)[42 U.S.C. § 12201(c)(2) ] recognizes the need for employers, and their agents, to establish and observe the terms of employee benefit plans *so long as these plans are based on legitimate underwriting or classification of risks*

. . . . .

In sum *ADA requests that underwriting and classification of risks be based on sound actuarial principles or be related to actual or reasonably anticipated experience.*

H.R. Rep. 101–485(III), 101st Cong. 2nd Sess.1990, *reprinted* in 1990 U.S.C.C.A.N. 445, 493–96. (emphasis added).

■ Speaking specifically of differentiation in coverages and benefits, the House Report made the following observation.

Under the ADA, a person with a disability cannot be denied insurance *or be subject to different terms ·or conditions of insurance based on disability alone, if the disability does not impose increased risks* ... Moreover, while a plan which limits certain kinds of coverage based on classification of risk would be allowed under [the safe harbor provision], the plan may not refuse to insure ... *or limit the amount, extent or kind of coverage available* ... solely because of a physical or mental impairment, *except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.*

H.R.Rep. No. 101–485(II), 101st Cong.2d Sess. 135–148, *reprinted in* 1990 U.S.C.C.A.N. 303, 419–20 (emphasis added); *see also* S.Rep. No. 116, 101st Cong. 1st Session (1989) (same). That the safe harbor provision exists is itself further evidence that Title I prohibits discrimination among classes of persons with disabilities. See *Johnson,* 273 F.3d at 1056 ("Denial of [benefits under a long term disability plan] on the express ground that the claimant is mentally disabled is discrimination of a sort prohibited by [Title I of the ADA]— unless the ADA's safe harbor provision exempts such discrimination from liability.") The passages quoted above from the statute's legislative history serve to fortify that proposition. Differences in coverages or benefits are to be tolerated under Title I only to the extent that they are based on rational classifications of risks. *See Interim Enforcement Guidance on the Application of the Americans with Disabilities Act of 1990 to Disability–Based Distinction in Employer–Provided Health Insurance,* Notice No. 915.002 at 3 (June 8, 1993) (hereinafter *"Enforcement Guidance"*), *available at* http://www.eeoc. gov/policy/docs /health.html ([D]isability-based insurance plan distinctions are permitted only if they are within the protec-

tive ambit of the [safe harbor provision.] ); *see also* Todd Prall, Note, *Why Can't Discrimination Be· Discrimination? Johnson v. Kmart Corp. and The Meaning of "Discrimination" Under the Americans With Disabilities Act,* 2003 B.Y.U.L. REV. 1419, 1413 ("Congress designed the safe harbor provision of the ADA to allow insurance companies and others to deal properly with risk factors in insurance plans.") If Title I permitted insurers or employers to offer different benefits to participants with mental disabilities from those offered to participants with physical disabilities, at the discretion of the employer or insurer, the safe harbor provision would hardly be necessary.

The question that now arises is who bears the burden of establishing how the LTD Plan fares under the safe harbor provision. Tufts argues that the claims of discrimination made by the plaintiff here must fail because the *plaintiff* has failed to allege that the LTD Plan is not a benefits plan that is outside of the protection of the safe harbor provision. The plaintiff counters that the burden is on the defendant to demonstrate that the LTD Plan falls within the safe harbor provision and thus is exempt from the ADA's general prohibition of discrimination. To put the matter differently, the defendants argue that the burden is on the plaintiff to plead and establish that the LTD is not sheltered by the safe harbor provision. Fletcher argues, on the other hand, that the applicability of the safe harbor provision is an affirmative defense to be asserted and established by the defendants in this case.

The First Circuit has not addressed the allocation of the burden of proof as to the applicability of the ADA's safe harbor clause. *See, e.g., Currie v. Group Insurance Commission,* 290 F.3d 1, 7 (1st Cir. 2002) (addressing the application of the safe harbor provision to a Title II claim,

but staying consideration pending resolution of parallel state litigation). I must therefore look to the language and structure of the statute to determine where that burden lies. I start with the observation that the safe harbor provision is an exception to the general prohibition against disability-based discrimination. *Compare* 42 U.S.C. § 12112(a) *with* 42 U.S.C. § 12201(c). As a specific exception to a broad remedial statute, the safe harbor provision partakes more of the character of an affirmative defense than that of a necessary element of a plaintiff's ADA claim of discrimination.

 Moreover, while the language of the safe harbor provision does not itself provide a clear answer to the allocation of the pleading burden, there is guidance in the legislative history of the ADA. As noted earlier, the House Report on the ADA states that the "ADA requires that underwriting and classification of risks be based on *sound actuarial principles or be related to actual or reasonably anticipated experience*." H.R.Rep. No. 101–485(III), 101st Cong. 2nd Sess.1990, *reprinted in* 1990 U.S.C.C.A.N. 445, 494 (emphasis added). Whether a benefits plan can be justified by rational underwriting principles or is based on actuarial data or reasonably anticipated experience requires knowledge of much more data than the typical plaintiff in a case of this sort is likely to have or can easily acquire. On the other hand, if such information exists, insurers like MetLife are likely to have ready access to it. Furthermore, an employer like Tufts, in ex-

ploring options among underwriters for the establishment of benefit plans, would far more likely be able to obtain access to the relevant underwriting information and actuarial data, if it exists, than a plan participant like the plaintiff. Given that the applicability of the safe harbor provision to the LTD Plan will depend upon actuarial or other empirical data more likely to be in the possession of insurers or employers like the defendants here, it follows that such parties should bear the burden of pleading and establishing the applicability of the safe harbor provision. I conclude then that the present amended complaint is not deficient in failing to allege that the LTD is not protected by the safe harbor provision, and that the plaintiff has stated a claim for discrimination under Title I of the LTD Plan.[5]

### C. Count II: Title III of the ADA

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services ... of any place of public accommodation ...." 42 U.S.C. § 12182(a). That title provides further that "[i]t shall be discriminatory to subject an individual or class of individuals on the basis of a disability ... directly, or through contractual, licensing or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, advantages or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i). In addition, Title III forbids "afford[ing] an

5. The view I have taken here with respect to the allocation of the burden of proof as to the application of the safe harbor provision to a long-term disability plan is consistent with the view that the EEOC has taken regarding disability-based distinctions in health-insurance plans, at least where the EEOC initiates the action. *See Enforcement Guidance* at 5. ("If the Commission determines that a challenged health insurance plan term or provision is a disability-based distinction, the respondent will be required to prove that the disability-based distinction is within the protective ambit of the [safe harbor provision].") *But see Johnson*, 273 F.3d at 1059–60 ("[W]e conclude that in the context of the ADA the subterfuge exception to the safe harbor provision requires that a plaintiff show that the employer specifically intended to discriminate based on disability ....")

individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii). The plaintiff argues that by offering her less coverage for her mental disability than it offered to persons with physical disabilities, defendant MetLife denied her the "full and equal enjoyment" of her benefits in violation of Title III of the ADA. *See* Plaintiff's Opposition at 7–8.

MetLife responds that Title III applies only to "places of public accommodation," and therefore does not cover benefit plans. *See* MetLife's Memorandum in Support of Motion to Dismiss at 5; *see also Weyer,* 198 F.3d at 1114–15; *Parker,* 121 F.3d at 1010–11; *Ford,* 145 F.3d at 612 ("Regarding MetLife, the disability benefits that [the plaintiffs] challenges do not qualify as a public accommodation and thus do not fall within the rubric of Title III."). MetLife's formulation of the scope of Title III, however, has been rejected by the First Circuit. *See Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n. of New England,* 37 F.3d 12, 19 (1st Cir. 1994) (defining the term "public accommodation" to include access to insurance plans).

■■■ While the decision in *Carparts* involved *access* to an insurance plan, the First Circuit discussed, but left open the question whether Title III also covered the *content* of such plans. *See id.* at 19–20; *see also Tompkins v. United Healthcare of New England,* 203 F.3d 90, 95 n. 4 (1st Cir.2000) (observing that "[t]he discriminatory denial of benefits under a health care plan might, in some circumstances, state a claim under Title III of the ADA."). Lower courts in this circuit, however, have applied the reasoning in *Carparts* to the *substance* of employee benefits plans. *See Conners,* 42 F.Supp.2d at 46 ("Title III's proscription applies to the substance of, rather than merely the access to, employee benefit plans ...."); *Boots v. Northwestern Mutual Life Ins.,* 77 F.Supp.2d 211 (D.N.H.1999); *Doukas v. Metropolitan Life Ins. Co.,* 950 F.Supp. 422, 427 (D.N.H. 1996) ("[T]his court's reading of the plain and ordinary meaning of Title III leads to the conclusion that the statute extends to an insurance company's denial of insurance."). For the reasons set forth in those decisions, I conclude that the anti-discrimination requirements of Title III extend to the content of insurance plans like the LTD Plan.

■■■ MetLife further contends that the plaintiff's Title III claim must fail as a matter of law because Title I provides the exclusive remedy for claims involving employment-related benefits. *See* MetLife's Memorandum in Support of Motion to Dismiss at 4–5; *see also Weyer,* 198 F.3d at 1113–16; *Motzkin v. Trustees of Boston University,* 938 F.Supp. 983, 996 (D.Mass. 1996). However, like its definition of "public accommodation," MetLife's position on this issue overlooks the First Circuit's decision in *Carparts,* which recognized the right of a plaintiff to challenge an employee health benefit plan under both Title I and Title III of the ADA. *See Carparts,* 37 F.3d 12 (1st Cir.1994); *see also Conners,* 42 F.Supp.2d at 46 (observing that "the [First Circuit] has held that Title III applies to discrimination in employee benefit plans"). Thus, the plaintiff may challenge her employee benefits plan under *both* Title I *and* Title III.

### D. Count III: ERISA

In Count III of her amended complaint, Fletcher claims that Tufts and MetLife

violated the Employee Retirement Income and Security Act ("ERISA") by improperly characterizing her disability as mental rather than physical in nature. *See* 29 U.S.C. § 1132(a)(1). Fletcher contends that the defendants should have classified her as having a physical disability, and further asserts that the conflict of interest inherent in having MetLife and Tufts make a determination as to the nature of her condition constitutes a *per se* breach of their fiduciary duties as plan administrators under 29 U.S.C. § 1132(a)(3). *See King v. UNUM Life Ins. Co.,* 221 F.Supp.2d 1, 4 (D.Me.2002).

I note at the outset that the plaintiff may not base her ERISA claim on § 1132(a)(3). As the *King* court ruled, 29 U.S.C. § 1132(a)(3) can only be used if no other portion of section 1132 is applicable. *See id.* Because Fletcher claims that the defendants improperly classified her disability as mental rather than physical in violation of § 1132(a)(1), I hold that section 1132(a)(3) is unavailable to her. She must proceed, if at all, under § 1123(a)(1).

Responding to the plaintiff's challenge as to the proper classification of her disability, the defendants contend that the claim is barred by the plaintiff's failure timely to exhaust available administrative remedies. *See* MetLife's Memorandum in Support of Motion to Dismiss at 8–11; Tufts Memorandum in Support of Motion to Dismiss at 14–16. The LTD Plan provides a sixty-day window in which an employee can request an administrative review of an adverse benefits decision. *See* Plaintiff's Opposition, Exh. C at 27. Because Fletcher did not request administrative review until, at the earliest, 296 days after her benefits were terminated, the defendants assert that her request was untimely, and that her subsequent ERISA claim fails to satisfy the exhaustion requirement.

Fletcher offers three arguments in support of her assertion that her ERISA claim is not barred by her failure to make a request for administrative review within the prescribed period. She asserts first that, unlike the ADA, ERISA does not contain an explicit requirement that administrative remedies be exhausted, but instead merely gives beneficiaries a right to administrative review. *Compare* 29 U.S.C. § 1132, *with* 42 U.S.C. § 2000e–5. As noted by MetLife in its reply, however, this position is contrary to First Circuit cases which hold that where the benefits plan provides for administrative review, principles of contract law require that the review process be exhausted before resort to a court may be had. *See Drinkwater v. Metropolitan Life Ins. Co.,* 846 F.2d 821, 825–26 (1st Cir.1988); *Terry v. Bayer Corp.,* 145 F.3d 28, 40 (1st Cir. 1998) ("*Drinkwater* mandates that [an ERISA] a claimant must have exhausted the plan's administrative remedies before bringing suit to recover benefits."). Timely exhaustion of administrative remedies therefore is a precondition to the bringing of this lawsuit.

The plaintiff next claims that her failure timely to exhaust her administrative remedies should be excused because MetLife misled her by advising that it "could probably" waive the sixty-day review period. *See* Compl. ¶ 30; Plaintiff's Opposition, Exh. C at 27. MetLife responds that this assertion is insufficient as a matter of law to trigger a waiver, because the most MetLife suggested was that it "could probably" waive the requirement, and the plaintiff never alleges in the amended complaint that she detrimentally relied on such a statement.

I agree. The alleged statement from a MetLife representative that MetLife "*could probably*" waive the time restriction on a request for administrative review

is insufficient to support an allegation that MetLife *did* waive, or intended to waive, the administrative appeals period. The statement spoke only of probabilities of what MetLife *could do,* not of commitment to a waiver. Indeed, MetLife's rejection of the request for administrative review on the ground that the request was untimely was the definitive response to any suggestion that MetLife "could probably" waive the time restriction: MetLife "could have," but did not waive the restriction. And, as MetLife points out, Fletcher has not claimed that she relied to her detriment on the representation that MetLife could probably waive the sixty-day requirement.

Finally, the plaintiff claims that her failure to exhaust administrative remedies should not preclude her ERISA claim because any request for review of the allegedly improper classification of her disability would have been futile. *See Drinkwater,* 846 F.2d at 826 ("Traditional exhaustion principles do include an exception for instances when resort to the administrative route is futile or the remedy inadequate") (internal quotations omitted). Fletcher bases her claim of futility on a case from Maine in which MetLife refused to characterize as physical a disability closely analogous to her own. *See Hess v. Allstate Ins. Co. and Metropolitan Life Ins. Co.,* Civil Action No. 99–384–PC, 2000 WL 1186262 *10 (D.Me. Aug. 2, 2000) ("Hess ... asserts that MetLife wrongly denied benefits in contravention of [ERISA] by classifying his condition as a 'mental or nervous disorder' when it is in fact physical.").

The First Circuit has held that "[a] blanket assertion, unsupported by any facts, is insufficient to call [the futility] exception into play." *Drinkwater,* 846 F.2d at 826. While the plaintiff does point to MetLife's position in past litigation, that evidence is not enough to allow her to avoid the exhaustion requirement here.

For one thing, the fact that MetLife refused to classify the *Hess* plaintiff as having a physical disability does not perforce mean that MetLife, in review of the particular circumstances of the plaintiff's disability would not have concluded that her disability has more of a physical character or origin than the disability at issue in *Hess.* In any case, the exhaustion requirement is designed to permit a more expert view of the characterization of the disability than a court can provide and should not easily be set aside on the ground of futility. Thus, a court's discretion to dispense with the exhaustion requirement on the ground of futility is appropriately limited. *See Springer v. Wal–Mart Associates' Group Health Plan,* 908 F.2d 897, 901 (11th Cir. 1990) (a "clear and positive" showing of futility is required before a court may suspend the exhaustion requirement.).

For all of the foregoing reasons, I conclude that the plaintiff failed to exhaust her administrative remedies under ERISA and may not, therefore, proceed on her ERISA claim. The defendants' motions to dismiss count III is therefore be granted.

## IV. Conclusion

Tufts motion to dismiss count I and MetLife's motion to dismiss count II are DENIED, and the defendants' respective motions to dismiss count III are GRANTED. The clerk shall set a date for a status conference in this matter.

SO ORDERED.